**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| EXPRESS MOBILE, INC., | |
| Plaintiff, | Civil Action No. 2:17-cv-00128-JRG-RSP |
| v. | **Jury Trial Demanded** |
| KTREE COMPUTER SOLUTIONS, INC., | |
| Defendant. | |

**DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

**I.      INTRODUCTION**

As depicted by representative claim 1, Express Mobile, Inc. took out patents (pre-*Alice*) on the idea of **collecting**, **displaying**, **storing**, and **manipulating** data and limited its claims to the particular technological environment of producing websites on and for computers having a browser and a virtual machine capable of generating displays. The Federal Circuit has time and time again invalidated such claims, including just a few days ago:

- *Intellectual Ventures I, LLC v. Capital One Financial Corp.*, 2007 WL 900031 (Fed. Cir. 2017) (idea of **collecting**, **displaying**, and **manipulating** data is abstract);

- *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) (idea of **collecting**, **displaying**, and **manipulating** data is abstract); *and*

- *Content Extraction and Transmission LLC v. Wells Fargo Bank, National Ass'n.*, 776 F.3d 1343 (Fed. Cir. 2014) (idea of **collecting**, **recognizing**, and **storing** data is abstract).

1. A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:

(a) presenting a viewable menu having a user selectable panel of settings describing elements of a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine; **Collect data**

(b) generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof; **Display data**

(c) storing information representative of said one or more user selected settings in a database; **Store Data**

(d) generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in a database; and

(e) building one or more web pages to generate said website from at least a portion of said database and at least one run time file, where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages. **Manipulate Data**

The claims neither improve the functioning of the computer (step one) nor recite an inventive concept (step two). After a generic sequence of steps involving data collection, display, and storage, the claims manipulate data by **building web pages** from (i) **a run-time file** and (ii) a **database**. In *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015), the Federal Circuit invalidated claims that also recited **building web pages** from a **template file** and a **database**. In fact, *Internet Patents*' claims also recited two alternative techniques of building web pages: (i) from a template file **and a conditional merge file**; and (ii) from a **template file, a database,** *and* **a conditional merge file**. *Internet Patents* held that none of these combinations supplied the requisite inventive concept for patent-eligibility purposes, citing the generic nature of template files and databases.

The claims-in-suit, like those in *Internet Patents*, do not feature any unconventional mechanisms, results or inventive concept in any ordered combination of claim elements, and are therefore distinguishable from the below step-two cases which held claims non-abstract for those reasons:

- *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014) (unconventional sequence of events upon clicking a hyperlink)

- *Bascom Global Internet Servs. Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) (inventiveness in the ordered combination of generic components—the installation of a filtering tool at a specific location remote from end-users with customizable filtering features specific to each end user)

- *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016) (unconventional technological solution of enhancing data in a distributed fashion to a technological problem of massive record flows previously requiring massive databases)

Just weeks ago, this Court acknowledged a maturing line of precedent from the Federal Circuit, now ingrained and fully established in the jurisprudence—subject-matter eligibility is now almost exclusively determined by comparing a claim at issue to those assessed in past cases.

*My Health, Inc. v. DeVilbiss Healthcare, LLC*, No. 2:16-cv-00535-RWS-RSP (E.D. Tex. Feb.
13, 2017). That is the analytical approach of this motion. Significantly, the analysis does not
depend on any claim construction for any claim limitation. As in *My Health, Inc.*, 2:16-cv-
00535-RWS-RSP, the same conclusion of ineligibility results from *any* plausible claim
construction for any of the claim limitations recited in any claim involved in this action.

Consequently, Defendant is entitled to a judgment on the pleadings that all claims-in-suit
are invalid under 35 U.S.C. § 101.

## II.     APPLICABLE LAW

**Section 101 of the Patent Act** defines patent-eligible subject matter as follows:
"Whoever invents or discovers any new and useful process, machine, manufacture, or
composition of matter, or any new and useful improvement thereof, may obtain a patent
therefore, subject to the conditions and requirements of this title." 35 U.S.C. § 101. **Exception**:
In interpreting this statutory provision, the Supreme Court has held that its broad language is
subject to an implicit exception for "laws of nature, natural phenomena, and abstract ideas,"
which are not patentable. *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).

**Two-step inquiry**: To determine whether the exception applies, the Supreme Court has
set forth a two-step inquiry. Specifically, a court must determine: (1) whether the claim is
directed to a patent-ineligible concept, i.e., a law of nature, a natural phenomenon, or an abstract
idea; and if so, (2) whether the elements of the claim, considered "both individually and 'as an
ordered combination,'" add enough to "'transform the nature of the claim' into a patent-eligible
application." Id. (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289,
1297–98 (2012)). Applying this two-step inquiry to claims challenged under the abstract idea
exception, we typically refer to step one as the "abstract idea" step and step two as the "inventive

concept" step. *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016).

**Decisional Mechanism**: A few weeks ago, this Court observed a maturing line of precedent from the Federal Circuit "recognizing that subject-matter eligibility is now almost exclusively determined by comparing a claim at issue to those assessed in past cases." *My Health, Inc. v. DeVilbiss Healthcare, LLC*, 2:16-cv-00535-RWS-RSP (Feb. 13, 2017).

## III.   ANALYSIS

### A.   Step One: The claims-in-suit are directed to the abstract idea of collecting, displaying, storing, and manipulating data.

Claim 1 of the '397 patent recites:

> *A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:*
>
> *(a) presenting a viewable menu having a user selectable panel of settings describing elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;*
>
> *(b) generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof;*
>
> *(c) storing information representative of said one or more user selected settings in a database;*
>
> *(d) generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in said database;and*
>
> *(e) building one or more web pages to generate said website from at least a portion of said database and at least one run time file, where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages.*

**Character of the claimed invention-in-suit (Step One)**: "Stripped of excess verbiage," *Intellectual Ventures*, 2017 WL 900031 at *5, claim 1 of the '397 patent concerns a method for producing Internet websites by collecting data, displaying data, storing data, and manipulating

data. The first step of claim 1 collects data from the user by using an interactive menu with selectable settings describing website elements. This step, therefore, involves **collecting data**. The second step displays a webpage substantially contemporaneously. This step, therefore, amounts to merely **displaying data**. The third step stores settings information in a database. This step, therefore, amounts to merely **storing data**. The fourth step recites generating a website by retrieving information in the database. But the fifth step recites building web pages to generate the website of the fourth step. So, the fourth step is actually carried out by the fifth step. The fifth step, in turn, claims building web pages (data) from the database (data) and a run time file (data) which utilizes information (data) in the database (data). Data in. Data out. This is quintessential data manipulation. The fourth and fifth steps of claim 1, therefore, amount to **manipulating data**. Claim 1 as a whole recites collecting, displaying, storing, and manipulating data.

**Comparison to Similar Cases**: Just last week, in *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 2017 WL 900031 (Fed. Cir. Mar. 7, 2017), the Federal Circuit affirmed that all claims of Intellectual Ventures I LLC's ("IV") U.S. Patent No. 7,984,081 ("the '081 patent") were invalid under 35 U.S.C. § 101. The Federal Circuit described IV's '081 patent as follows:

> The '081 patent consisted of twenty-nine claims relating to methods, systems, and apparatuses for dynamically managing eXtensible Markup Language ("XML") data. XML is a specialized mark-up computer language developed in the mid-1990s that defines a set of rules for encoding documents in both a human-and machine-readable format. Given this unique encoding, XML documents have specific format requirements for the data contained in the document, and tags that define what data the system stores at each position within an XML document. See J.A. 895 (discussing the use of nested structures to preserve the relationship of data within a given XML document). The '081 patent explains that companies frequently use XML documents to publish various types of information that customers and partners use, such as invoices, purchase orders, and price lists. Because XML users can create their own unique formats using these XML rules, not all formats are compatible. Therefore, companies attempting to share these types of XML documents may find them incompatible with their own XML

formats. Resolving this conflict, the '081 patent contends, was a difficult task that required specialized programming skills to manipulate and transfer XML documents into the desired format.

Thus, the '081 patent identified what its inventor perceived as a need to "allow[ ] the user to view and update XML documents in different formats, and allow[ ] the user to manipulate the data and perform actions without programming skills." '081 patent col. 1 ll. 45–48. To fulfill this need, the patent describes presenting the user with a second document—the "dynamic document"—which is based upon data extracted from the original XML document. According to the patent, the user can then make changes to the data displayed in the dynamic document and the changes will be dynamically propagated back into the original XML document (despite the acknowledged compatibility problems with such documents).

*Id.* at *4-5.

Claim 21 of the '081 patent recites:

> *An apparatus for manipulating XML documents, comprising:*
>
> *a processor;*
>
> *a component that organizes data components of one or more XML documents into data objects;*
>
> *a component that identifies a plurality of primary record types for the XML documents;*
>
> *a component that maps the data components of each data object to one of the plurality of primary record types;*
>
> *a component that organizes the instances of the plurality of primary record types into a hierarchy to form a management record type;*
>
> *a component that defines a dynamic document for display of an instance of a management record type through a user interface;and*
>
> *a component that detects modification of the data in the dynamic document via the user interface, and in response thereto modifies a data component in an XML document. '081 patent at col. 20 ll. 43-61.*

**Character of IV's Claimed Invention as a Whole (Step One)**: The Federal Circuit

assessed the claim as a whole as follows:

> In short, the '081 patent concerns a system and method for editing XML documents. Stripped of excess verbiage, the claim creates the dynamic document based upon "management record types" ("MRTs") and "primary record types"

("PRTs"). The inventor coined these terms to describe the organizational structure of the data at issue. A PRT is a simple data structure that contains unspecified data extracted from XML documents and an MRT is merely a collection of PRTs. '081 patent col. 2 ll. 5–12. A user interface then displays the dynamic document to the user to permit the user to make modifications to the document. In response to these changes made to the dynamic document, the system somehow modifies the underlying XML document.

*Id.* at *5.

**Decisional Mechanism in Action at the Federal Circuit**: The Federal Circuit held that

the above claim was directed to the abstract idea of "collecting, displaying, and manipulating

data." *Id.* at *5. To support this holding, the Federal Circuit cited its precedent in similar cases:

> We have held other patent claims ineligible under § 101 for reciting similar data manipulation steps. For instance, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, National Ass'n*, we held the concept of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" abstract. 776 F.3d 1343, 1347 (Fed. Cir. 2014). In particular, the invention there involved extracting data from a document, entering the data into appropriate data fields, and storing the data in memory. *Id.* at 1345. In *Intellectual Ventures I LLC v. Capital One Bank (USA)*, we concluded that customizing information and presenting it to users based on particular characteristics is abstract as well. 792 F.3d 1363, 1370 (Fed. Cir. 2015) ("Intellectual Ventures I"). And in *Electric Power Group*, we explained that an invention directed to collection, manipulation, and display of data was an abstract process. 830 F.3d at 1353–54 (Fed. Cir. 2016). Here, the '081 patent's concept related to the collection, display, and manipulation of data is similarly abstract.

*Id.* at *5.

**Comparison**: Pursuant to the precedent in *Intellectual Ventures I*, 2017 WL 900031

(Fed. Cir. 2017) (collecting, displaying, and manipulating data), *Content Extraction*, 776 F.3d

1343 (Fed. Cir. 2014), (collecting, recognizing, storing data), *Intellectual Ventures I LLC*, 792

F.3d 1363 (Fed. Cir. 2015) (customizing and displaying data), and *Elec. Power Grp. v. Alstom

S.A.,* 830 F.3d 1350, 1353 (Fed. Cir. 2016) (collecting, manipulating, and displaying data), the

idea of collecting, displaying, storing, and manipulating data is also an abstract idea. Therefore,

claim 1 is directed to an abstract idea.

**No improvement in computer function or capability**: When computer-related claims are at issue, courts look to whether the claims purport to "improve the functioning of the computer itself," which may suggest that the claims are not abstract. *Alice*, 134 S. Ct. at 2359. Thus, claims that recite improvements in computer functionality are patent eligible. *See Enfish*, 822 F.3d at 1339 (method for improving "the way a computer stores and retrieves data in memory" was non-abstract); *McRO v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (claims "focused on a specific asserted improvement in computer animation" were non-abstract). However, if "computers are invoked merely as a tool" in the asserted claim to carry out an abstract process, the claim is still considered to be abstract. *Enfish*, 822 F.3d at 1336.

In *Internet Patents*, 790 F.3d at 1348, the template file and database used to generate web pages were regarded as invocation of generic tools. In this case too, the invocation of run-time files and databases to generate web pages is a mere invocation of generic tools. In *Internet Patents*, the Federal Circuit did not issue a step-one-and-done ruling just because people could use generic browsers to do something more—navigate back and forward without losing data during form filling. Likewise, in this case, this Court should not issue a non-abstractness finding at step one just because users can do more with browsers (webpage building) using the inventions. Tellingly, virtually every invalidated software claim empowers or enables users to *do more* with computers.

**Step one conclusion**: All claims-in-suit are directed to the abstract idea of collecting, displaying, storing, and manipulating data.

**B.     Step Two Analysis: Combing through each claim's individual limitations and any combination of limitations does not reveal an inventive concept sufficient to transform the claimed abstract idea of collecting, displaying, storing, and manipulating data into a patent-eligible application.**

Under step two of patent eligibility analysis, the Court must scrutinize the elements of the claim more microscopically—both individually and as an ordered combination—to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application. *See Alice*, 134 S.Ct. at 2357; *FairWarning IP LLC v. Iatric Sys., Inc.*, 839 F.3d 1089 (Fed. Cir. 2016). This inventive concept must do more than simply recite "well-understood, routine, conventional activity." *Id.* at 1093.

In *Intellectual Ventures I*, the Federal Circuit ruled:

> [T]he claims recite both a generic computer element—a processor—and a series of generic computer "components" that merely restate their individual functions—i.e., organizing, mapping, identifying, defining, detecting, and modifying. That is to say, they merely describe the functions of the abstract idea itself, without particularity. This is simply not enough under step two. *See Ultramercial*, 772 F.3d at 715–16 (holding the claims insufficient to supply an inventive concept because they did not "do significantly more than simply describe [the] abstract method," but rather are simply "conventional steps, specified at a high level of generality") (quoting Alice, 134 S. Ct. at 2357).

2017 WL 900031 at *7.

This is exactly the case with the claims-in-suit which, like *Intellectual Ventures I*, recite a series of generic structural limitations (in red below) corresponding to generic computer components or web tools. And each functional limitation (green) merely describes a conventional step specified at a high level of generality corresponding to some function of the abstract idea of collecting, displaying, storing, and manipulating data without any particularity. This is simply not enough under step two.

A method to allow users to produce Internet websites on and for computers having a **browser** and a **virtual machine** capable of generating displays, said method comprising:

(a) **presenting** a **viewable menu** having a user selectable **panel of settings** describing **elements** on a **website**, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to **commands to said virtual machine**;

(b) **generating** a **display** in accordance with one or more user selected settings **substantially contemporaneously** with the selection thereof;

(c) **storing** information representative of said one or more user selected settings in a **database**;

(d) **generating** a **website** at least in part by retrieving said information representative of said one or more user selected settings stored in said database; and

(e) **building** one or more **web pages** to generate said website from at least a **portion of said database** and at least one **run time file**, where said at least one run time file **utilizes** information stored in said database to generate **virtual machine commands** for the display of at least a portion of said one or more web pages.

**<u>Structural limitations—nothing inventive to see here</u>**: As to the structural limitations (red), the patent does not hint at, let alone describe, let alone claim, any innovation or improvement in *any* single of the numerous structural limitations (in red) above. For example, the patent does not teach and claim an improvement or unconventional change to database technology as in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) (claims in patent directed to information management and database system were not directed to abstract idea of organizing information using tabular formats but were directed to specific ways in which computers operate, embodied in self-referential table which functioned differently than conventional database structures and achieved other benefits over conventional database). Similarly, the patent did not teach an unconventional or improved virtual machine, display, interactive menu, or any singular prior art tool invoked in its conventional manner to yield conventional results. "*Mayo* noted the insufficiency of 'well-understood, routine, conventional activities previously known' to found an 'inventive concept.'" *Internet Patents*, 790 F.3d at 1348.

**<u>Functional limitations—nothing inventive to see here</u>**: Likewise, as to the functional limitations (in green), the patent claims are not limited to *any* specific, novel way of *presenting* a menu, *generating* a display, and *storing* information in a database. *Any* way of accomplishing these tasks is within the claims' scope. No novel mechanism—no mechanism at all—is defined for any of these steps. They are empty generic verbs—infringed upon performance in *any* way. Notably missing is any mention of a novel, specific, or unconventional mechanism to implement any of these functions. That leaves us with three recited functional limitations for further analysis:

(i)    **generating** a website in step (d);

(ii)   **building** web pages to generate the website of step (d) from the database and a run time file in step (e);

(iii)  **utilizing** information stored in the database to generate virtual machine commands for displaying web pages, also in step (e).

"**<u>Generating a website</u>**": The "generating a website" function of step (d) is actually the result of step (e)'s "building web pages" function because the claim language of step (e) expressly recites "building one or more web pages to *generate said website*." Thus, there is nothing unconventional or otherwise inventive in the website of step (d) itself because it refers to the web pages built in step (e).

"**<u>Building web pages</u>**": Here, the claim recites "building one or more web pages ***from*** [i] at least a portion of said database and [ii] at least one run time file." The claim is silent on how to actually build the web pages. The single restriction is that the step should draw upon two sources of data—the run time file and the database. This is insufficient detail for how a computer

*accomplishes this webpage building function*, as confirmed by the Federal Circuit's holding in *Internet Patents v. Active Network, Inc.*, 790 F.3d 1434 (Fed. Cir. 2015).

**_Internet Patents_ analogy**: In *Internet Patents*, 790 F.3d 1434, much like the claims-in-suit, the patent claims recited a user interface that used (i) a template file and (ii) a database to generate websites. The Federal Circuit found this recitation void of inventive concept. In fact, the claims in *Internet Patents* were arguably *less* abstract than the claims-in-suit because they recited more than just the combination of a template file and a database to generate websites. As an alternative design, the *Internet Patents* claims themselves recited a user interface that used (i) a template file and (ii) a conditional merge file. But they did not stop there. As a <u>third</u> alternative design, the *Internet Patents* claims recited a user interface that used (i) a template file; (ii) a database; *and* (iii) a conditional merge file. Not one of these combinations sufficed. The Federal Circuit ruled that adding the limitation of a template file, database, a conditional merge file, or any combination of those failed to amount to an inventive concept because it represented merely generic data collection steps or amounted to siting the ineligible concept in a particular technological environment. 790 F.3d at 1349.

"**Utilizing information**": The run-time file, per the claim language, utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages. But, as usual, the claims contain *nothing* about how this utilization must occur. *Any* conceivable utilization of the database falls within claim scope so long as the result is generating virtual machine commands for displaying web pages.

**Result-focused functional limitations:** The claims-in-suit recite various functional limitations, none of which specify an innovative, unconventional, and in most cases *any* <u>mechanism</u> for carrying out that step. The singular focus on the *result*—**present** the menu, **store**

the data, **display** the webpage, **generate** the website, **utilize** the information in the database,

**build** the webpages. Put another way, "the claim language here provides only a result-oriented

solution, with insufficient detail for how a computer accomplishes it. Our law demands more.

*See Elec. Power Grp.*, 830 F.3d at 1356 (cautioning against claims "so result focused, so

functional, as to effectively cover any solution to an identified problem")." *Intellectual Ventures

I*, 2017 WL 900031, at *7; *see Internet Patents*, 790 F.3d at 1348 ("[C]laim 1 contains no

restriction on how the result is accomplished. The mechanism for maintaining the state is not

described, although this is stated to be the essential innovation.").

   ***DDR Holdings* is distinguishable**: In *DDR Holdings v. Hotels.com, L.P.*, 773 F.3d 1245

(Fed. Cir. 2014) the Federal Circuit held that certain patent claims directed to systems and

methods of generating a composite web page that combined certain visual elements of a host

website with content of a third-party merchant were directed to patent-eligible subject matter.

Prior art systems allowed third-party merchants to lure the host's visitor traffic away because

visitors would be taken to the third-party merchant's website when they clicked on the

merchant's advertisement on the host site. The claimed invention solved this problem by creating

a new web page that permitted a visitor to be in two places at the same time. Instead of taking the

visitor to a merchant's website, the inventive hyperlink directed the website to a generated

composite web page that displayed product information from the third-party merchant but

retained the host website's look and feel. Thus, the host could display third party products while

retaining visitor traffic.

   ***DDR Holdings* claims specified an unconventional mechanism:** In finding that these

claims were not abstract, the Federal Circuit cited the novelty in overriding the routine and

conventional sequence of events ordinarily triggered by the click of a hyperlink. Instead of the

computer network operating in its normal, expected manner by sending the website visitor to a third-party website connected with the clicked advertisement, the claimed system generated and directed the visitor to a hybrid web page that presented the third party's product information while retaining the visual "look and feel" elements of the host website. Significantly, the Federal Circuit noted that the claims did not attempt to preempt every application of the idea of increasing sales by making two web pages look the same. Rather, they recited a specific way to automate the creation of a composite web page by an "outsource provider" that incorporated elements from multiple sources to solve a problem faced by Internet websites.

**No unconventional mechanism specified in the claims-in-suit**: Express Mobile's claims-in-suit glaringly lack the counterpart of the novel "outsource provider" which, in *DDR Holdings*, supplied the *mechanism* for implementing the unconventional behavior of the invention. *DDR Holdings*' hyperlinks, due to the "outsource provider," behaved in an unexpected, unconventional manner. The claims-in-suit, by contrast, fail to specify any unconventional or innovative concept. The user selects settings off a menu in a conventional manner with conventional results. The data is stored in the database in a conventional manner with conventional results. The display is presented in a conventional manner with conventional results. The invention builds web pages from the run-time file and the database in an ***entirely unspecified*** manner, let alone an unconventional manner. And as *Internet Patents* confirms, combining a run-time file and a database to build web pages is not unconventional for patent-eligibility analysis. 790 F.3d at 1348. The run-time file utilizes information in the database in a conventional manner with conventional results. The lack of unconventional mechanisms/results up and down these claims also distinguishes this case from *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016) (unconventional technological solution of

enhancing data in a distributed fashion to a technological problem of massive record flows previously requiring massive databases).

**Examination of ordered combination for inventiveness**: As explained in the Introduction section, the ordered combination of the claim elements of collecting, displaying, storing, and manipulating data has been rejected as inventive in case after case. Express Mobile may instead cite the specific combination of elements of (1) a run time file; and (2) a database for building or generating web pages. Again, the Federal Circuit assessed a similar combination of claim limitations in *Internet Patents* and invalidated claims 2 and 10 of U.S. Pat. 7,707,505 for failing to claim eligible subject matter. 790 F.3d at 1348. Each of these claims generated web pages using two features: (1) a template file and (2) a database. The lack of inventiveness—in the specific combination of the run-time file and the database for building webpages—also renders this case distinguishable from *Bascom Global Internet Servs. Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) (inventiveness in the ordered combination of generic components—the installation of a filtering tool at a specific location remote from end-users with customizable filtering features specific to each end user).

## C.  Claim 1 is representative

Claim 1 of the '397 patent is representative of the asserted claims for subject matter eligibility analysis. Independent claims 2 and 37 are apparatus counterparts of method claim 1. Instead of the steps of collecting, displaying, storing, and manipulating data, claims 2 and 37 recite the structural limitations of an interface, a database, and a build tool which accomplish the same functions. Because these claims only differ in the form in which they are drafted but are identical in substance, they warrant the same subject matter eligibility analysis and conclusion as claim 1 under step one.

**Dependent Claims of '397 patent**: Next, we turn to the dependent claims of the '397 patent.

- Claim 6 recites, "The apparatus of claim 2, wherein said elements are selected from the group consisting of a button, an image, a paragraph, a frame, a table, a form and a vector object." (more particular, but still relates to a particular type of data collected, displayed, stored, and manipulated).

- Claim 9 recites, "The apparatus of claim 2, wherein said elements include a button or an image[], wherein said selectable settings includes the selection of an element style, and wherein said build engine includes means for storing information representative of selected style in said database." (more particular, but still relates to a particular type of data collected, displayed, stored, and manipulated).

- Claim 10 recites, "The apparatus of claim 9, wherein said elements are described by multiple object states." (more particular, but still relates to a particular type of data collected, displayed, stored, and manipulated).

- Claim 11 recites, "The apparatus of claim 9, wherein said elements are described by a transformation or a timeline[] of said selected styles." (more particular, but still relates to a particular type of data collected, displayed, stored, and manipulated).

- Claim 14 recites, "The apparatus of claim 2, wherein said elements include buttons or images, wherein said description of elements is a transition or a timeline which is selected according to input from a mouse, and wherein said build engine includes means for storing information representative of said selected description of elements in said database." (more particular, but still relates to a particular type of data collected, displayed, stored, and manipulated).

- Claim 15 recites, "The apparatus of claim 14, wherein at least one of said description of elements is a timeline or an animation." (more particular, but still relates to a particular type of data collected, displayed, stored, and manipulated).

- Claim 17 recites, "The apparatus of claim 2, wherein one or more of said elements is a button or an image, wherein said description of elements is a transition, an animation or a timeline, and wherein said build engine includes means to synchronize said description of said one or more elements." (more particular, but still relates to a particular type of data collected, displayed, stored, and manipulated).

- Claim 20 recites, "The apparatus of claim 2, wherein at least one of said elements is a child button or a child object, wherein said description of said elements is a timeline, a transition or an animation, and wherein said build engine includes means for defining said description of said element." (more particular, but still relates to a particular type of data collected, displayed, stored, and manipulated).

- Claim 23 recites, "The apparatus of claim 19, wherein said description of elements is a transition or a timeline which is selected according to input from a mouse, and wherein said build engine includes means for storing information representative of said selected description in said database." (more particular, but still relates to a particular type of data collected, displayed, stored, and manipulated).

- Claim 24 recites, "The apparatus of claim 2, wherein said run time files include one compressed website specific, customized run time engine program file and one compressed website specific, customized run time engine library file." (more particular, but still relates to manipulating data).

- Claim 25 recites, "The apparatus of claim 24, wherein said run time files include a dynamic web page scaling mechanism, whereby each of said one or more generated web pages is scaled for viewing on said display." (more particular, but still relates to displaying and manipulating data).

- Claim 35 recites, "The apparatus of claim 2, wherein the build engine includes dynamic resizing means operable to redefine a size of a web page upon being display." (more particular, but still relates to displaying and manipulating data).

The highlighted structural limitations make each claim more particular. But the underlying concept of each dependent claim as a whole merely encompasses the abstract idea of collecting, displaying, storing, and manipulating data. *Intellectual Ventures I*, 2017 WL 900031 at *6 ("Although these data structures add a degree of particularity to the claims, the underlying concept embodied by the limitations merely encompasses the abstract idea itself of organizing, displaying, [storing,] and manipulating data of particular documents.").

**'168 Patent**: Next, we turn claims 1-6 of the '168 patent. This patent is related to the '397 patent. That is, they share a common specification. Claim 1 recites:

*A system for assembling a web site comprising:*

*a server comprising a build engine configured to:*

*accept user input to create a web site, the web site comprising a plurality of web pages, each web page comprising a plurality of objects,*

*accept user input to associate a style with objects of the plurality of web pages, wherein each web page comprises at least one button object or at least one image object, and wherein the at least one button object or at least one image object is associated with a*

*style that includes values defining transformations and time lines for the at least one button object or at least one image object; and wherein each web page is defined entirely by each of the plurality of objects comprising that web page and the style associated with the object,*

*produce a database with a multidimensional array comprising the objects that comprise the web site including data defining, for each object, the object style, an object number, and an indication of the web page that each object is part of, and*

*provide the database to a server accessible to web browser;*

*wherein the database is produced such that a web browser with access to a runtime engine is configured to generate the web-site from the objects and style data extracted from the provided database.*

**'168 patent is just like '397 patent for eligibility analysis**: Stripped of excess verbiage, claim 1 of the '168 patent concerns a system for assembling a website, just like claims 2 and 37 of the '397 patent concerned a system for producing Internet websites on a web browser, with variations about the nature of the data that is collected, displayed, stored, and manipulated. Whereas the '397 patent's apparatus claims recite the structural limitations of an interface, a browser, a database, and a build tool for respectively collecting, displaying, storing, and manipulating data, the '168 patent's claims recite a server with a build engine which is configured to do exactly these tasks. To be sure, the '168 patent's independent claim 1 recites claim language that renders it more particular than independent apparatus claims 2 and 37 of the '397 patent. For example, whereas the '397 patent's claims recited elements on a website, the '168 patent's claims recite objects on a web page such as "button objects" and "image objects." These objects are "associated with a style that includes values defining transformations and time lines." Claim 1 of the '168 patent also requires a database with a multidimensional array comprising the objects including data defining an object style, an object number, and an indication of the web page that each object is part of. This level of detail about button and image

objects on web pages adds a measure of particularity without changing the fundamental nature of what this claim is about.

**_Digitech_ confirms that particular claim limitations do not change the character of the invention**: In _Digitech Image Techs. v. Elecs. For Imaging_, 758 F.3d 1344 (Fed. Cir. 2014), the Federal Circuit categorized—as mere data gathering and data combining—a process of taking two data sets that were generated by taking existing information—_i.e._, measured chromatic stimuli, spatial stimuli, and device response characteristic functions—and organizing this information into a new form. The claims in that case recited particular limitations such as "device dependent transformation of color information content," "device independent color space," and "device dependent transformation of spatial information content." The claim limitations of the '168 patent, such as "button object," "image object," "multidimensional arrays," "transformation," "timeline," "object styles," "numbers," and "indications of web pages" are similar. Like _Digitech_'s claim limitations, these also bring a measure of particularity to the claimed invention. But they are, individually or as a group, incapable of altering its fundamental character which remains the abstract idea of collecting, displaying, storing, and manipulating data. _See Intellectual Ventures I_, 2017 WL 900031 at *6 ("Although these data structures add a degree of particularity to the claims, the underlying concept embodied by the limitations merely encompasses the abstract idea itself of organizing, displaying, [storing,] and manipulating data of particular documents.").

**Dependent claims of '168 patent**: Next, we turn to the dependent claims of the '168 patent.

- Claim 2 recites, "The system of claim 1, wherein one of said plurality of objects is a child, and wherein the build engine is configured to accept user input to associate a style with child button and child image objects."

- Claim 3 recites, "The system of claim 2, wherein at least one of said styles includes values defining time lines for child button and child image objects."

- Claim 4 recites, "The system of claim 1, wherein at least one of said styles includes settings for multiple object states."

- Claim 5 recites, "The system of claim 1, further including file size reduction means for reducing the total size of files generated by said build engine to a size of between 12K and 50K."

- Claim 6 recites, "The system of claim 1, where said data is stored as one or more of a Boolean an integer, a string, a floating point variables, or a URL."

These dependent claims, as the highlighted claim limitations illustrate, are mere constraints on the data, *e.g.*, data size or data types, or on the webpage objects. Again, each makes the corresponding dependent claim more particular. But the underlying concept of each dependent claim as a whole merely encompasses the abstract idea of collecting, displaying, storing, and manipulating data. *Intellectual Ventures I*, 2017 WL 900031 at *6 ("Although these data structures add a degree of particularity to the claims, the underlying concept embodied by the limitations merely encompasses the abstract idea itself of organizing, displaying, [storing,] and manipulating data of particular documents.").

All these claims, without a doubt, recite ideas that enable people to build websites with numerous features using a browser and a computer. This improves the performance of the activity of building webpages from the user's vantage point. But that does not mean the idea, as claimed in these patents, is eligible for patent protection just because people benefit from using the idea. For example, the following abstract ideas, when implemented on a generic computer, without question *improved* performance of that activity from the vantage point of the user, *e.g.* (i) hedging risk in the commodities market in *Bilski v. Kappos*, 561 U.S. 593 (2010) (same); (ii) updating alarm limits in catalytic conversion processes in *Parker v. Flook*, 437 U.S. 584 (1978)

(same); (iii) converting binary-coded decimal numbers into pure binary numbers in *Gottschalk v. Benson*, 409 U.S. 63 (1972) (same).

The implicit exception in Section 101 for abstract ideas quit claims these data collection/storage/display/manipulation inventions to the general public unless they improve the computer's capabilities of functionality, recite a specific, unconventional mechanism for achieving the innovation's results, or do more than invoke conventional tools to bring about expected results. Limiting them to website building using browsers, virtual machines, etc. does not rescue them from the exception—*particularly* in light of the **cluster** of ineligible precedent identified in this brief.

### D.  No necessity for claim construction

Claim construction for any of these claim limitations does not alter the nature of the step-one or step-two analyses presented in this motion. This Court could test this hypothesis out by applying the narrowest possible claim construction to any individual claim limitation in any of the claims and assess whether the comparison to similar cases and distinction from dissimilar cases is any less persuasive—it is not. These claims intake data from people wanting to build web pages. They output web pages, another form of data. No construction is capable of giving birth to an unconventional mechanism or result for any individual limitation or combination of limitations.

### IV.    CONCLUSION

Precedent compels the conclusion that the claims-in-suit are invalid under 35 U.S.C. § 101.

Dated: March 15, 2017                              Respectfully submitted,

 */s/ Amit Agarwal*
Amit Agarwal
California Bar No. 294269
14420 Edinburgh Moor Dr.
Wimauma, FL 33598
Telephone:  (310) 351-6596
Email: ama7386@gmail.com

Bobby Lamb
State Bar No. 24080997
GILLAM & SMITH, L.L.P.
303 South Washington Avenue
Marshall, Texas 75670
Telephone:  (903) 934-8450
Facsimile:  (903) 934-9257
Email: wrlamb@gillamsmithlaw.com

*Attorney for Defendant*
*KTree Computer Solutions, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 15, 2017, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3).

*/s/ Bobby Lamb*
Bobby Lamb

## CERTIFICATE OF COMPLIANCE WITH THE COURT'S
## 35 U.S.C. § 101 MOTION PRACTICE ORDER

_____ The parties **agree** that prior claim construction is not needed to inform the Court's analysis as to patentability.

__X__ The parties **disagree** on whether prior claim construction is not needed to inform the Court's analysis as to patentability.

*/s/ Amit Agarwal*
Amit Agarwal

22